We will hear argument in Amenot v. Securities and Exchange Commission. Mr. Siegel. Good morning. May it please the Court, my name is Martin Siegel, Brown, Redmond, Burlack, Israels for Appellant v. Amenot. If I may, I'd like to reserve three minutes of my time for rebuttal. Granted. Thank you. This is an appeal from an order entered by the Securities and Exchange Commission that found that Amenot violated section 10b and rule 10b-5 of the Securities Exchange Act of 1934 by developing and implementing a computerized automated trading program in order to obtain market data rebates from NASDAQ. The SEC found that most of the market orders that were sent by the automated trading program over a three-day period resulted in more sales and that the payment of $50,000 in rebates to Market XT, which was the company that Ms. Amenot worked for, was a fraud on other members of the Consolidated Tape Association. Can I ask you a question about that, Mr. Siegel? Sure. You say that the Commission wrongly rejected the ALJ's credibility findings in your briefing, right? We do. Now, it seems from what the Commission said that they thought, and I'm going to try to give you some of the figures here. This is from page 12 of their opinion, that the SPY, I guess by two, program resulted in match orders 99 percent of the time, that the day before that, they matched 94 percent of the time, and the DIA orders matched 75 percent of the time, and that the day before that, the DIA orders matched 100 percent of the time. And then looking at it over the three days, the Commission concluded that 70 percent of the trades that Mr. Amenot engaged in were wash and match trades, and the other 30 percent included trading that wasn't made with the SPY. Given that those are the numbers that the SEC came up with, and that the ALJ had said that there were, quote, only a few pairings among thousands of trades, unquote, even assuming there were credibility findings, which the SEC disputes, why wouldn't that sort of a discrepancy be enough for us to say, well, the SEC is entitled to look at data and make its own judgments? Part of it is interpreting the data. Data was not self-interpreting. There were a number of witnesses who testified on both sides, including experts by Mr. Amenot and an expert by the SEC, and credibility does apply to expert testimony. The ALJ accepted the testimony of the Amenot expert. But are we reviewing the ALJ's decision, or are we reviewing the Commission's decision? You're reviewing the Commission's decision, but with respect to credibility findings. But where is the word credibility used? The only credibility determination that I've seen where the word might have been used was when the ALJ was less than thrilled at the Commission's expert. Beyond that, made findings of fact, made legal conclusions, but didn't say, I looked into his eyes, I watch his demeanor, he's sweating, I don't believe him. That's a credibility determination. In any event, are we reviewing the ALJ's opinion, or for purposes of our review, isn't that almost a nullity? No, it's not. There's numerous courts of appeals cases, including this Court's decision in United, that say that where an ALJ and the Commission disagree, in order for credibility determinations to be overturned, in order for there to be substantial evidence, the Commission has to specifically, sort of finding by finding, say why they disagree. You just can't have a broad conclusory statement. That's why I mentioned that specifically, when you say you just can't have a broad conclusory allegation. You say there's no substantial evidence, broad and conclusory. I've just selected, although I could pick others, a series of items where the SEC says, look, we're looking at the data, this is what the data tell us. And you say, well, it's credibility because it's looking at an expert. But this is not a credibility determination in the sense that Judge Mary's just described, where they said, he looked nervous and fidgety and looked like a liar. They're looking at data. How come the SEC can't look at data? It's the interpretation of the data, and that was a credibility issue. And they're incompetent to look at the data and make a judgment? Well, in the issue of, are these trades simultaneously? Because it's not just whether a trade matches that makes it a wash trade. It's also whether it's simultaneous. And one of the findings, based on credibility of the witnesses that the ALJ made, was that for an automated trading program on a market such as market XT, where trades settle in milliseconds, one thousandth of a second, the normal trading settlement time was 20 milliseconds. So when the one, two, three seconds, those are simultaneous. That's how you get these numbers. If you accept the fundamental testimony by the SEC's expert, which the ALJ of the seeing the witnesses decided was not credible and was not correct. Is that credibility? Is it credibility to say simultaneous is milliseconds, but it's not one to two seconds? That, in your position, is an issue of credibility and not an issue for the SEC to say in its own expertise and understanding what is simultaneous and what isn't? You need an expert to tell you what's simultaneous? In the context of this case, yes, I believe you do. Because what this dealt with was a whole new technology. There was a program adopted. There's only been two cases ever that dealt with this. And it's an automated trading program. And I believe it was a credibility finding by the judge that, by the ALJ, that when the SEC expert uses simultaneous to be the same thing as if you trade an individual trades on a stock exchange, and that's not a finding or credible, but she adopted specifically the findings by Mr. Amanat's expert as to what would be simultaneous. And what is the commission supposed to do with that finding? And what are we supposed to do with the commission's return to our standard of review and what we are reviewing? And I don't, speaking only for myself, believe that we're reviewing the ALJ's determination, although I wonder why we even need an ALJ here. If the commission is going to review the ALJ's determinations de novo, it almost seems like a waste of time to engage in that step. And I think the ALJ, in this case, did a terrific job. But why don't we move off the credibility finding and on to the issues? Okay, just on one issue on credibility. In United, this court, one of the cases we cited, said that when an agency fails to adopt the credibility findings of a hearing officer, the agency must make a finding or ruling on each exception taken in the officer's report. The commission did not do that here. Well, you're assuming their credibility findings. We seem to take issue with you on that. So why don't you just move on? Well, Your Honor, just when you deal with issues of intent, that is a credibility. When you determine that one person had an intent, whether that intent is used for specific intent, as we say, is necessary or for recklessness. The commission said Amanat intended to have wash sails. Amanat testified he did not intend to have wash sails. That's a credibility finding, whether she said I based that on credibility or not. In regards to how you categorize it, Mr. Stegall, here's another piece of evidence that you need to contend with. The SEC said, look, he called up and asked for rebates after he knew that there was a problem with this training, that questions, very serious questions had been raised. His own company had pulled the plug on him. The next day he calls up and says, in effect, give me money. He said, did we qualify? Yeah. Well, he wasn't just curious. He wanted money, right? I mean, that was the whole purpose of the program. He calls up and says, in effect, here are our trades. We want money. The SEC looks at that and says, that tells us there was a problem with this man's mindset. Now, again, I put it to you, the SEC is not and draw a conclusion from it? They can't. Okay. Then if they draw that conclusion about intent, then why would we say to the SEC, that's wrong, you just can't do that? They used the wrong standard for intent. Section 9A, one of the securities, same act as contains section 10B, has a specific section dealing with wash trades and matched orders and says, wash trades and matched orders are illegal. Do you have any authority for the position that 10B doesn't stand on its own? That it doesn't make unlawful behavior if there's an intent, assuming there's an intent, as the SEC claims there is, under circumstances like this? I don't believe the SEC found an intent. It said his calling afterwards was recklessness and distinguish that from the kind of intent that's required for a purpose. You have to have a purpose under section 9A. Rocky's Fund, which was a First Circuit case, and we recognize Rocky's Fund did not resolve the issue because it held that under neither standard was intent established. Was Sienta established? We say it was not because of Sienta. That's why Rocky's didn't have to go there. Rocky said whether you use a specific intent standard using the purpose or whether you use merely recklessness, neither standard was established. In this case, we're not disputing that there are facts in the record that if recklessness was all that's required, such as the one Judge Joyden referred to, somebody could make an inference. We think it's the wrong inference, but they had the power to make that inference. Our argument is you can't have the same words in the same statute mean different things. We've cited Rocky's Fund. The ALJ found that there's the Gustafson's case at the Supreme Court in which the Supreme Court determined trying to decide what prospectus in a companion statute meant. You can't have different definitions in different statutes. You can't use different words. There's a specific statement that deals with match daughters and wash trades in the Securities Exchange Act. Our position, which the ALJ adopted, we think, which is what Rocky's Fund implied, even though they didn't have to read the issue, is you can't have wash trades illegal under one section of the same statute and not be illegal under the other. Otherwise, legitimate transactions can fall. You can pick and choose which statute. Interesting, the SEC website, which is cited throughout both parties' papers, takes the same position. It says that defines a wash trade and says wash trades are illegal under section 9A1 with 10B5 if they are done for the purpose of creating an artificial market. Now, the SEC argues, well, Aminat, who looked at the website, testified that that can't be because there's a disclaimer on the website. Well, it turns out that that disclaimer was not on the website. It wasn't added until after Aminat testified, three years after the facts, that he relied on the website that they first added that disclaimer. Do you think that the Commission gave sufficient deference to really the undisputed fact that NASDAQ told Aminat that even trades that crossed internally, you know, one of his buy orders would execute against one of his sell orders, would be qualifying trades? No, they ignored it. They didn't give any deference to it. And that's what we say about going to, if the purpose issue is a requirement that you need to have some purpose here in order to have 9A and 10B5 sort of be aligned so that conduct, the same conduct is not violative of one section of the same act and legal under another section. In order for that to happen, you have to take into account the credibility finding, if you will, that he did not intend his transactions to match. He didn't intend to have any effect on the marketplace. He was doing what he thought he had been told that he could do. And that's why if you do look at a purpose requirement, if there's any purpose requirement to wash trades in this case, then we believe that the SEC, they didn't even attempt to satisfy that standard. Your red light is on. And my last rhetorical question was in honor of the upcoming baseball season. I gave you one right over the plate. Thank you very much. All right. We'll get you back on your bottle. Thank you very much. Good morning. May it please the court. I'm Susan McDonald, representing the Securities and Exchange Commission. This case in all relevant respects is like the Graham case. Mr. Amanat, there's no dispute in the record. The trading data is not disputed that thousands, over 14,000 of his trades on these three days matched against each other. He was on either side of the trade. That is the definition of a wash trade, no change in beneficial ownership. And that is case after case has recognized that Ernst & Ernst versus Hockfelder, as we pointed out in our brief, there's no other requirement for something to be a wash sale. So if I use that term wash sale, that's what I'm talking about, no change in beneficial ownership. So as I said, there's no dispute that the overwhelming majority of his trades involved no change in beneficial ownership. He's just trading with himself. Well, there's a big dispute though, right, Ms. McDonald, about whether, assuming that's true, it was unlawful. And Mr. Siegels just argued that the SEC would have us construe the statute in an internally inconsistent way. Could you speak to that directly, the notion that something would be unlawful under 10B and still lawful under 9A doesn't make any sense and that the court shouldn't approach the case in a way that would allow that to happen? Well, Herman and McClain versus Huddleston pretty much settled that. The Supreme Court said that 10B stands on its own, that even if some other specific provision covers conduct, that if it meets the elements of a 10B violation, then it's a 10B violation. And the U.S. environmental case is a manipulation case that would have come under 9A2, but it was charged as 9A, I'm sorry, as 10B. And the Second Circuit said that that was sufficient, that reckless participation in a manipulation was sufficient under 10B, that you didn't have to meet some specific intent under Section 9. So I think U.S. environmental and the Charnay case similarly said the same thing. And the Commission itself has repeatedly so held. Are you acknowledging that if we did, the SEC would have a problem here? Because there's not been a showing of a purpose? Well, let me just say, I think that the precedent from the Supreme Court is not just that you don't have to reconcile, it's that you don't have to reconcile. And I think that's affirmatively that the securities laws are meant to be complete and preclude all fraud. And for that reason, the catch-all provision 10B is to be read flexibly. Sure, I understand your position. I understand your position is 10B stands on its own, don't worry about 9A. And then my question to you is, as a factual matter, are you acknowledging that the record wouldn't support a finding of an unlawful purpose as would be required under 9A? Under 9A1, yes. Yes, if that specific purpose was required, he didn't, there's no indication that he was intending to affect the market. And the Commission did not, that wasn't charged, and the Commission did not. And as I said, the Graham case... But the Commission found it wasn't necessary, but it was there, if he needed it, that under both, you'd have them. No? I'm sorry? Both specific intent and recklessness had been shown here. Wasn't that what the decision said? Perhaps so. Perhaps you're right, Your Honor, because... You didn't need the specific intent, but even if you did, you had it. Yes, because they said he did. Actually, it affected, it created the impression of active trading, because that's why the Consolidated Tape Association paid out the market data revenue for these trades. They thought that they were actual trades. They wouldn't have paid the revenue had they known that these were not legitimate trades. Do I have a real problem here with Santer? I really do, speaking only for myself. The guy, the guy, the appellant, was a computer programming genius, I think, seems like. And looking at the whole thing, I don't get the... I don't see where the Santer has been shown. Well, Your Honor, the Commission finding that Amanat acted with Santer is well supported by undisputed evidence in the record. His own expert, as the Commission observed at page A6 of its opinion, his own expert testified, and this is at page A1227, that the design of the code, and he's talking here about Amanat's program, his specific R Levi 2, the design of that code was such that it would cause the buys and sells to match up against each other. His own expert... But he doesn't say that the expert, that Amanat knew that that would happen. These were two potential problems of which Amanat was unaware. Well, Your Honor, he said it was designed to... Amanat was an expert programmer. There is no... Amanat has never said, oh, I made a mistake in the program. He has never claimed that. He was an expert programmer. Everyone said he was absolutely the best programmer. He supervised. He was the supervisor of 30 programmers. He was the head, the technology head. And he got approval all the way up at his company. Not for this specific feature and not for the... Because nobody knew, he, including him, that this would happen. Well, even if, even if one were to believe that he didn't know and that he didn't design it, as his expert said, expressly to have these match up, even if that were the case, on March 25th, he was put on notice that there was something seriously wrong. He was told that people were accusing him of painting the tape. He admitted... One man was accusing him of painting the tape, a man who was going with a competitor who wasn't talking to him and who understood the Java code, which he didn't understand. Well, I don't believe that has anything to do with it, Your Honor. He admitted that he could have called compliance on the 25th to check and make sure that his trades were okay. He was being alerted that somebody thought something was wrong. He also admitted at pages A1656 and A1616, he admitted that he himself suspected on the 25th and 26th that he was on both sides of the trades. Of course, he'd been told... This is the question that I asked Mr. Siegel. He'd been told at 1446 to 52, it appears, by NASDAQ that this would be okay. No, Your Honor. He was not told that. He was told that crossed orders, different customers, different customers sending orders from the same firm, but different customers, that if those... I don't read it that way. I read it one of his buy orders against one of his sell orders. That's the way I read that. Well, that is not in the industry. It's well known in the industry, you can sell, you can have different customers have orders that cross, but wash trades are viewed in the industry as being illegitimate. They are fictitious trades. They're not real trades. They are fictitious. Did he know, Ms. McDonald, that the program R Levi 2 was going to sweep his own company's accounts before it went outside? Yes, he knew that. Is that relevant somehow? He said at page A1628, he knew that Market XT swept its own book. Is that relevant? Well, yes, because he programmed... His own expert pointed out that he programmed a hold, a three-minute hold on the buy orders to wait for the corresponding sell. And I want to make one thing very, very clear. Tell me, tell us why that's important. Why is the fact that it was sweeping internally and that there was a hold meaningful? Because it meant it was almost inevitable that the corresponding order from him would match up with the other. It couldn't route out to the wider market because it was told to wait on the market. And... Why didn't 100% of the trades execute against one another? I guess a few of them escaped, but certainly virtually all of them matched against each other. And I just want to make it clear, there is absolutely no dispute in the record that there were milliseconds between each buy and sell order. It wasn't two to three seconds. So that's another point on which the ALJ was just completely wrong. The ALJ was wrong on that. Yes, absolutely wrong. And she even, Aminat's brief points out, it's either his reply brief or his brief points out that the ALJ incomprehensibly, she has a footnote saying that the buys and sells were within milliseconds of each other. And yet in the body of her opinion... There was a separation. But milliseconds, milliseconds. But that's this world we live in with this. I don't even know how to answer a cell phone. I'm trying to understand these arguments. I understand. I feel the same way. I gather that's not bad in and of itself that whether it's milliseconds or 10 days. Right. If there were open market transactions, you wouldn't care, right? Exactly. He's just trading with himself. It's fictitious trading. He's not trying to make money. He's just trying to increase the number of trades to get the fee. The appearance of the number of trades. It's the appearance of trades. And I want to point out, he quotes the Mulherrin case as saying that wash trades are legitimate trading. That is absolutely not true. The Mulherrin case at footnote 5, in fact, expressly says that wash sales create the appearance of a legitimate activity. The implication being they're not legitimate activity. That was the case. It didn't involve wash trades. The point was that in Mulherrin, the court said, look, because the real trades were involved there. And so they said, this isn't like a normal manipulation where you have hallmarks of manipulation like wash trades and matched orders. And then they point out in the footnote that those kinds of transactions, no change in beneficial ownership, create the appearance of legitimate activity. Why should the Nasdaq care though? Why should they care with whom he's trading? They just want people to increase the volume. What's the difference between Mr. Amanat and someone who's sitting at home on a computer who's addicted to trading over the internet, who's just trading 100 times a day? What's the difference? Okay. One very important reason. The Consolidated Tape Association, the administrator testified without any contradiction in the record that the CTA does not consider trades with no change in beneficial ownership to be legitimate trades. They do not pay market data revenue for such trades. Nasdaq was paying a portion of market data revenue as rebates. So Nasdaq wouldn't have gotten any market data revenue out of which to pay a rebate had the CTA known that these were not legitimate trades, that they were sham transactions. And Nasdaq, presumably, it wouldn't have, the whole point, Nasdaq was trying to get market share. The idea is these exchanges compete for market share of actual people doing real trades. That's what they wanted to do. If you look at Mr. Nogito's testimony, and I know he was a rely on him, except that he said something that happens to be absolutely accurate, is that it would have been okay to offer some kind of incentive to people to come to the market XT system. That's what Nasdaq was talking about. They wanted their other firms that executed through Nasdaq to get more customers to do real actual transactions so they'd get a larger share of the whole market. They weren't trying to get nothing, get sham pretend transactions. I mean, if the market share could be upped by trading with oneself, of course, I suppose everybody would be in the market trading with oneself. Exactly. If this were okay and all firms could do it, then you'd have just huge volumes of sham transactions going on, and that would seriously distort the market. So, but I wanted, as to Syanter, I wanted to, so therefore the Commission relied not only on the design of the system, but also on the fact that Aminat was alerted on the 25th. He admitted he could have gone and looked at the Gemini screen, that's at page A, 15-16. But isn't that negligence as opposed to recklessness? What he could have, or maybe what he should have done. No, at the point where he is told that, you know, somebody thinks there's something seriously wrong here. Tell us the person who told him. You say at the point when he's told, told by whom? I'm sorry? Told by whom? That's, you're relying on the comment, right? The comment by his, the paying tape comment. Yes, but Aminat, several people, Aminat didn't hear it from Mr. Nogito, apparently. Aminat said he heard other people told him that Nogito had said this. That Nogito said it, and tell us who Nogito is. He was a, another programmer. Who was going with the competitor. Yes, but that, that. Who Aminat was not speaking to because of that, and would not speak to here, because he didn't want to discuss, disclose trade secrets that Nogito could tell Island. Well, Your Honor, with all respect, I, I, the Nogito was alerted to a possible problem, which he could easily have checked on. He could have gone to compliance. He admitted he could have gone to compliance and had them check on it. He could have looked at the Gemini screen himself, and he did nothing. And so that, that really is the question, I think, to a certain, I mean, he did nothing. Is that negligence? Is that even gross negligence? No, Your Honor, I believe. Does it have to be recklessness? Yes, and I believe this is certainly reckless, that deliberate ignorance is a form of knowledge, that at least, as the Seventh Circuit said in Jacobowski, and that is exactly what comes to mind with respect to that situation, but even if the court were to reject that, and on page A-19, the court said, at the very least, Aminat knew on the 27th, when his employer, I'm sorry, the compliance people, because remember, Aminat was an officer of this firm. He was an owner, and he had an ownership interest, but he was told by compliance that the program had to be shut down, that his trades were wrong. And yet, he, and he turned around, and without even revealing any problem to NASDAQ, he asked for the rebates. He did not say to NASDAQ, oh, there might be a problem. Somebody needs to check and see. Some of my trades might not be, might not qualify. He just asked for the rebates. And if the court has no further questions, I'd like to urge the court to affirm the commission decision in all respects. Thank you. Thank you. Rebuttal, Mr. Siegel. First, we do dispute that Aminat testified that he knew that the trades were being held. In fact, if you recall the testimony about the single lane and the double lane, and why it was multi-threaded, which the hearing, ALJ credited, and said he did not realize that his trades would not be consecutive and that they would end up matching out. How could he say that, though, when they're executing in milliseconds? You've got thousands and thousands of trades that are canceling each other out. How could you urge us to say that the commission could not draw the inference that he intended to engage in wash trades? Well, they did draw that inference, but again, it goes to his knowledge and his testimony was he sent these consecutive, their market orders, the way he understood the system would work, which is a brand new system, a market order as opposed to a limit order would go out to the market and then to be followed by the sell order and could be filled out in the market. And because of some changes in Java, which he was not familiar with, he didn't realize, the testimony that she referred to was he was being asked the question, well, did it hold it? Yes, now that I look back on it, I didn't realize it at the time. But the commission didn't buy that, though. That's true. But don't we have to defer to that judgment? I don't believe so, because that was a credibility issue. Issues of intent. But substantial evidence is all they need, right? Correct. Well, it's more than a scintilla, right? Except with regard to credibility, they just can't draw a conclusion. And since they didn't cite anything for the, they didn't cite the record. They just made their conclusory statement. You can't tell where in the testimony. And we don't believe that the conclusion, some of those conclusions, which we cited in our brief, that there was substantial evidence for that. There's just a conclusion. That's what I'm struggling with. When you say, Mr. Siegel, they just made a sort of a bald conclusion. I take it you're referring to the footnote that you cited in your brief. But in the body of the SEC's opinion, it talks about the thousands and thousands of match trades, the percentages, the fact that he was the designer of the program. And as your opponent said to us just before she sat down, that after told by his own compliance officer, these are bad trades, he picked the phone up and said to NASDAQ, where's my rebate? Now, those are not bald assertions of some conclusion. They are statements about what the SEC said happened. And I guess I'm wondering how you can have those in the record and say to us, that's not more than a scintilla. That's not substantial evidence on which the SEC could make a conclusion about whether Mr. Amanat knew or didn't know what his program was doing. Well, first of all, calling up and saying, did I have enough trades, he was not told the nature of the problem. The CTA statement, that wasn't public anywhere. That is, they're looking at it in hindsight under their position. Wait, wait, wait. Didn't his compliance officer say, after he restarted the program, and as he put it, all hell broke loose. That's, I think, his characterization of the reaction internally to him starting the program back up. And they told him, these are bad trades. And then he makes the call. You're telling us that that's not something that the SEC can look at and say, well, that tells us something about his mindset. What it tells you is consistent with his testimony, is he did not realize that even though they were washed trades, even though they crossed in part because of what he'd been told by NASDAQ, that that meant you could not qualify for rebates. He's told that there's a problem with the program. Nobody explained what the problem was, why it was wrong. In fact, if you read the testimony, people were observing the trading earlier, and no one told him to shut it down. Of course, you'd have to have us believe that a fellow who really does seem to be extraordinarily bright, self-taught computer programmer, comes up with cutting edge stuff like this, working in the industry, chief technology officer of the company, that somehow when he's told, these are bad trades, he just doesn't get it. Oh, I don't get it. How is the SEC wrong to say, smart guy, should have got it. We think he got it. Again, if you go back to the time in question, when everybody, including NASDAQ, was saying trading for trading, said you don't have to make money, all you need to do is have less of a cost. You have everybody in his firm knowing that that's the way the program is designed. Are you asserting that NASDAQ ever told him washed trades are good? Not at all. And what I'm saying is they said cross trades are good. So when he's told your trades are wrong because they end up crossing against your own trades, no one explains the nature of the problem or that that would not qualify. Just like the CTA didn't come out until after, as you put it, oil held you broke loss. That's not how I put it, that's how he put it. Okay. But the fact is, it was with regard to, gee, these trades, you got to stop. Okay, I'll stop. Gee, do these qualify anyway? He didn't know or realize that even by asking that question, because no one said what was wrong, how it was wrong. There was no published literature. The SEC website didn't say it was wrong unless you had a purpose. Just two quick things. I just have to ask you, just on a common sense level, your client, he wasn't trying to make any money. What was he doing? What was he doing except ginning up volume to get the payment? That trading and the trade not crossed would have been a legitimate activity. He was trying to do what everybody told him, NASDAQ and his own compliance people before him. NASDAQ didn't tell him to gin up trades to get the fee. Again, if the trades, he could, the problem, the flaw in the program as he called it, there was enough time by sending the trades out, there was enough time for them to come back, etc. People told him, if you could do a trade, that you don't have to make money on, but as long as your cost is less than the rebate, you will make money. If the cost is less than the rebate, why did he increase the share size to 500? Because there was a complaint by somebody that you're just having too many trades. Nobody said wrong trades. You're having a lot of trades, you're having trouble handling all these trades at that level. But at 500, he was above the trade rebate that he stood to gain, right? The $1.60 that he stood to gain, at 500 share increments, he was exposed to lose money, unless they were washed trades. Not necessarily. If it goes out to the market and is filled immediately before the market changes, since it could be filled in 20 seconds... But how can he be sure that the market's going to do that? He can't be, which is one of the reasons... But if they're washed trades, he can be sure. But he didn't go back to the 100 share trade until he spoke to NASDAQ, and NASDAQ said, yes, it's okay to have 100 trade shares. People have told you that... They don't know what they're talking about. 100 trade shares are fine. But doesn't the fact that he went to 500 share trades belie his spread trading theory? What it does show is that he wasn't intending to do washed trades, he was intending to do what people said was a legitimate activity, trading for trading's sake, because there were times when he was exposed to risk. It shows that this was not a plan, a plan from the beginning. This is what I'm going to do, and I'm going to wash. That very instance is one of the factors that shows that he did not intend to do washed trades. He was intending to do trading for trading's sake, because NASDAQ and his compliance people all said that that was a legitimate activity. And you're right, that's an instance of when he was at risk, which supports his, I didn't intend to do washed trades, and I didn't realize at the time that Market XT would hold the trade, a market trade. And don't forget, there's a whole bunch of literature and testimony about limit orders. They did not charge the limit orders, where he set the price as being wrong. They only said the orders that you put in at the market were wrong, because they ended up matching against each other. His testimony was, I did not realize that they would match against each other. Your time is way over. The Huddleston case that she cited involved two different statutes, not the same statute, which she says, they didn't take a section from the Securities Act of 33 and apply it to the 34 Act. And the other case, she was environmental. They specifically found that there was an intent to manipulate. Thank you. Thank you very much. The case is well argued. We will take it under advisement.